## Case No. 7,932.

### KREBS v. CARLISLE BANK.

[2 Wall. Jr. 33.] [1]

Circuit Court, E. D. Pennsylvania. April Term, 1850.

**BANKS—EQUITY BETWEEN PARTNERS OR STOCKHOLDERS.**

1. Where stockholders in a bank, whose charter gives them a right, but does not oblige them to pay in full, the price of stock subscribed, pay, some of them in full, and some but in part, and

[1] [Reported by John William Wallace, Esq.]

the bank goes into liquidation from a loss sufficiently partial to allow such a rule: the stockholders who have paid in full have a right to a return of the excess paid by them above the others, who have paid but in part, before any division of its balance takes place. This balance is then to be divided (after deducting the loss) rateably among the stockholders. And this, though the bank has been in operation for many years, making dividends of profits in proportion to the amounts paid in.

2. A. B. and C. each subscribe, in 1814, to the stock of a bank, whose shares are $50, to be paid as the bank board shall direct. In 1817 the board directs. that all the stockholders pay $30 a share; and allows them to pay part, or all the balance. B. pays $10 of the balance, and A. $20—the whole balance: so that A. has paid in all $50, B. $40, and C. $30. The bank makes semi-annual dividends on profits till 1845, when, having $200,000 of its allowed capital paid in, it meets with a loss of $50,000, and goes into liquidation. A. is entitled to receive $10 on his share, before B. receives any thing. And A. is entitled to $10 more on his share, and B. $10 on his share, before C. receives any thing: and then, the loss being deducted, they are to receive rateably.

The Carlisle Bank, in Pennsylvania, was incorporated in 1814 (Act Assem. Pa. March 21, 1814); its capital was "not to exceed $300,000," and was divided into 6000 shares, of $50 each. In organizing it, the different persons who took stock signed an agreement, directed by the act of incorporation, by which they "agree to pay to the president, directors, &c., the sum of $50 for each share of stock set opposite to their names, in such manner and proportions as shall be determined by the board of directors," &c. Five dollars a share, was paid at the time of subscribing; and certificates of stock issued to the different subscribers, "subject, however, to all the payments due or to grow due thereon." "Calls" or requirements for additional instalments of $5 each, were made at five several times, between the organization of the bank in June, 1814, and December, 1817. But the board never required any of the stockholders to pay any instalment beyond the sixth, and some of them did not even comply fully with the "calls." Some, however, paid not only all the instalments asked for, ($30), but paid also, without any request, the remaining $20, which was the full price of the shares. On the 8th of April, 1828, the board "resolved, that the cashier be authorized to give notice to the stockholders. that the bank will receive any further payments they may wish to make, until the 1st of January, 1829." There was no evidence that this notice was generally given. Several stockholders, however, now paid in different sums; some in full; some not so. These payments were made as well after, as before the 1st of January, 1829, the limit fixed by the resolution. At another stated meeting in June, 1829, the members present, being unanimously of opinion, that the "privilege" of paying in full "is promotive of the interests of the bank," extended the time, until it should be otherwise directed. No general notice appeared to have been given of this resolution, any more than of that of the 8th of April preceding. But several

additional shares were now paid in full, and some paid to different amounts above the $30 previously required. The bank was in operation, from 1814 till 1845, and was employed in the usual business of banking. During this term fifty-eight dividends were made, averaging a fraction over 6 per cent. per annum (the legal rate of interest in Pennsylvania) upon the different amounts paid in. In May, 1836, about two-thirds (or $200,000) of the capital limit being paid in, and the bank having a considerable amount of inactive funds, it made a large purchase of United States Bank shares. A loss of about $50,000 followed, and the Carlisle Bank having resolved to wind up its affairs, a question arose between the different stockholders, as to the manner in which the assets were to be divided; whether for example, A., who had paid $50 per share was to receive $10 per share on each of his shares before B. who had paid but $40 per share should receive anything; and whether A. was to receive $10 more, and B. $10 on each of his shares before C. who had paid but $30 per share, should receive anything? Or whether the capital after deducting losses was to be divided between A., B., and C. pro rata, or in proportion to the amount of money invested by them respectively in the stock of the bank? The directors, acting under an opinion of Mr. Binney, thought the former the proper way; and several actions having been brought against them by dissatisfied stockholders, in the local courts, Krebs, a stockholder, who had paid in full; now, "in his own name as well as in the names and behalf of such other persons, stockholders, &c., as shall come in and become parties hereto and contribute to the expenses of the same," brought this suit—a bill in equity, with a view to have a decree "which should at once bind and conclude all the stockholders, and protect the institution" from further vexation.

Mr. Frederick Watts, for dissatisfied stockholders.

In organizing the bank, a contract was made the basis of everything, and is the expression of every one's obligation; the expression not only of the obligation of all to the bank, but also of each subscriber to every other subscriber. The stockholders agree then with the bank and with each other to pay "in such manner and proportions" as the board shall "determine." This is an agreement to pay in no other way. It is conceded that the board, whose duty it was to determine everything in the matter, never "determined" that any one should pay beyond the $30 called for; while they did "determine" that all should pay to that amount. That, then, is the whole, absolute and exclusive determination in the matter; and measures the whole obligation in the matter. What, then, the over-paying stockholders have done, was a voluntary act of their own; done prior to 1828, in an irregular way, by a private as-

sent of the receiving clerk, and never done at any time in a way that was regular. The over-paying stockholders, profiting by what they deemed a "privilege," put in their money. For the long term of thirty years it has been a privilege: and they have enjoyed the profits of it; profits which have been above the rate of legal interest, and much above what in fact could have been had continuously through a term of so many years. Whether great or small, however, is not important. They had their chance. Suppose the bank was going on. Would not this loss be shared rateably? Why is the liquidation to change the equity? Suppose, even liquidating as we are, that the speculation had proved a profit. Would not the profit be shared rateably? Again we ask, why or how is the liquidation to change the thing? If the whole capital paid in, had been exactly absorbed by the loss, would the stockholders who have paid .$30 be called on in liquidation to divide the remaining $20 with those who have paid $50? Illustrate the case by figures and an example. A., B., and C. agree to form a house, of which the capital shall be $300,000, each contributing a third, to be paid at the call of A. A. calls for $50,000 apiece, which is paid. The partners agree that any partner may pay the remaining $50,000, and participate in the profits accordingly. B. pays it. The firm first gains $100,000. Of course, A. and C. receive $25,000 profits apiece, and B. receives $50,000. The firm next loses $100,000; so that but $100,000 of stock remains: and a liquidation is resolved on. By our division A. and C. would each take $25,000, and B. $50,000, and on a final settlement each would come out of the firm as he went in and relatively equal. But the other side, paying back to B. his whole $50,000, and dividing the remaining $50,000 between the three, gives to each $16,666. Now how does this leave the parties on the whole partnership? A. and C. put in $50,000 apiece. They each received, in profits, $25,000, and in liquidation $16,666. They have therefore each lost $8,334 on their original capital. B. put in $100,000, and received in profits $50,000. He now receives $50,000 to equalize him, and $16.666 in liquidation. He has therefore gained $16,666 on his original capital. In other words, A. and C. have each lost 16 p. c. While B. has gained 16 p. c. This is unjust, and it arises from this unjust principle, that as to profits B. is a partner, while as to losses he is a creditor. And that he makes his stock an investment or a loan as suits his interest.

II. Admit that all these irregular and generally undesired payments, were "determined" by the board. Then the board has settled the "proportions" in which the stockholders should pay. They have settled that they would have in this bank $30 shares, $40 shares, and $50 shares. It is not uncommon in corporations to have old stock and new stock, and shares of different amounts. These shares, of course, were constantly sold, trans-ferred, and treated as different sorts of shares. The whole course and dealing of the bank and of all its members with the public, for a term of thirty years—from the origin to the end of the charter—is not to be set aside as nothing. There were shares, then, of different kinds or values. The owners of the larger ones, of course, make larger ventures; those of the smaller ones, smaller; but all alike make ventures, and the returns, whatever they are, are to be proportioned to the value of the shares.

III. But if the bank, in its corporate character, could not make "shares," differing in amount, and each a complete share, yet the stockholders, by their long course of action, individually and through the board—by their long division of profits and losses, on this basis of unequal shares—having settled for themselves a division of profits and losses on this principle, why is it now, for the first time, to be departed from? The whole argument of the other side will proceed upon the equity between partners. Is there not here, in our application of it, this very equity above every other?

IV. The speculation which caused the loss, was brought about by an excess of funds, the result of these unrequested, irregular, or illegal payments. The whole proper action of the board was on a capital of $30 a share. Having a power to call for full payment, they did not. Of course they could not depend on full payment, nor properly provide as on the basis of it. These stockholders pay in their money without request. The money is idle. Idle money, like "idle hands," is not well employed when employed in banks. The investment was one of madness, as it proved to be of ruin. But the very cause of it, was the act of the over-paying stockholders.

John Reed and W. M. Biddle, for the bank, (which they represented as stockholders, merely,) submitted its case to the court under the opinion of counsel, already alluded to, which it offered as its justification, and which, by consent, was read as an argument.[2]

---

[2] Opinion: I have considered this case, and am of opinion, that A. is entitled to receive ten dollars on his share before B. receives any thing, and A. is entitled to receive ten dollars more on his share, and B. ten dollars on his share, before C. receives anything, and then that they are all entitled to receive pro rata. There is no way in which these payments by A. more than B., and by both of them more than by C., can be considered, that will not lead to the same result. They are either a loan or advance to the bank, constituting a debt, or they are payments under their agreement of 21st of April, 1814, as under the determination of the directors, in pursuance of the act regulating banks. While I do not deem it material to this question to say with certainty, what they are, whether debts or contributions to capital, under the charter, I am of opinion that they are contributions to capital, under determinations of the board, because the board adopted and ratified such payments; and they are contributions which give to the shareholders who thus paid, the same

Mr. Penrose and H. M. Watts, for stockholders who had paid in full.

A case identical in principle, and almost identical in instance, arose in 1843, in the supreme court of Louisiana. Millaudon v. New Orleans & C. R. Co., 3 Rob. (La.) 488, 513. The arguments there were, in a great degree, the same as those made here. The case was well argued on both sides. The court gave a decree such as we ask. A motion was made for re-hearing, but after a powerful argument in support of it, a re-hearing was refused. The syllabus is as follows: "The act of incorporation of a banking company provided that its capital should be divided into shares of $100, of which $5 should be paid at the time of subscribing for the stock, and the residue in such instalments, and at such times, as might be required by the directors. Fifty dollars on each share were called in, and paid. A resolution, subsequently adopted by the directors, provided, 'that any stockholder who shall pay in anticipation a part, or the full amount due on the stock held by him, shall be entitled to dividends thereon, in proportion to the amount so paid in.' Under this resolution a stockholder paid up the whole amount due on the stock held by him, and received dividends thereon, and loans (less, however, than the amount so advanced by him), upon the pledge of it. The bank having gone into liquidation, required the repayment of the loan, and refused to call for further contributions from the other stockholders. An action was commenced by the stockholder who had paid in full, against the bank, to compel the calling in of the whole amount subscribed, or, in default thereof, or in the event of the inability of the stockholders to pay the balance due, to recover the amount paid by him beyond fifty dollars on each share, with interest on the over-payment, and to restrain the company from exacting repayment of the loan made to him, until the stockholders should be placed on an equality as to their payments. The bank, thereupon, sued on the notes given for the loan. On appeal from a judgment rendered in the two actions, which had been consolidated: Held, that no stockholder can be liable for more than one hundred dollars on each share held by him, and that each share must lose an equal amount on the final liquidation of the bank. That if the whole capital be sunk, those who have paid but fifty per cent., will be debtors for the balance; and those who have paid in full, cannot be called on for more. That if but half have been lost, the former are no further liable, but a balance will be due to the stockholder who has paid in full. That the payment of the whole amount of the shares under the resolution of the directors, did not change the relative position of the stockholders to each other as partners, except as to the dividends, the one having merely anticipated the payment of all he could ever be called on to pay, and the others remaining liable for the balance of their subscriptions. That the payment was under the tacit condition that, if the concern proved profitable, the party so paying, should receive dividends in proportion to the amount paid by him, and on the winding up of its business, after payment of the debts from the surplus profits, the whole amount so paid in; and, if not profitable, that he should lose only the same proportion, upon each share, as the other stockholders. That quoad the creditors of the bank, the excess above fifty per cent. so paid in, is capital, liable for its debts; but that, as among the stockholders, the party who made the advance is a creditor to the extent

---

equities against the bank and each other, for all they paid. as if all the stockholders had paid the same amount. All the stockholders took their certificates subject to all payments due and to grow due; and when the directors received payments from some more than from others. the stockholders so paying. were entitled in equity to the benefit of this clause in the certificates of all, and in equity the directors were bound to use it, if necessary, for their protection. The omission of the directors to call upon all to pay to the same extent. could not prejudice any of the stockholders who had paid. The duty of the other stockholders continued what it was originally. Their liability remained, and still remains. for the benefit of the other stockholders, as much as for creditors: and it is unnecessary to enforce it. only because equity will make the same distribution of the fund. as if the directors had expressly determined that all should pay, and had compelled payment from all. Whether debts or contributions to capital. under the subscription agreement, is however immaterial. If debts to the extent of the excess. they of course must be paid before any portion of the capital is distributable among the stockholders. If they are contributions to capital. which one has made to a greater extent than others, all being bound to contribute the same amount, and every stockholder being entitled in equity to the benefit of this agreement as much as the corporation was. then it follows that in the division of the remaining capital, they who have advanced their full share, or more than others, are entitled to be paid first. so as to restore equality between them. This is the principle of co-partnership under like circumstances, and the stockholders of a bank are co-partners. and have, as against each other, the same equities in the distribution of the partnership funds after payment of debts. The consequence of the principle of pro rata distribution. claimed for those who have paid least. is this, that although all were and are bound to pay the same amount, yet that he who paid the whole of his share. must pay a greater portion of the debts than he who paid less; whereas. every share. by force of the agreement to pay it in full. is bound to pay the same portion of the debts; and if the directors do not compel a full payment by all. or attain the same end. by the distribution of what remains of the capital, they violate the equity of the stockholders among themselves. At the close of such a partnership concern. a court of equity would decree. if necessary, that the partners who had not paid their full shares. should pay up, or if it was unnecessary. because justice could be done between the parties in the distribution of the fund, they would decree so much in the first place to the partners who had paid most. as would produce equality among all, and then distribute among all pro rata. The same is the equity among shareholders in a bank. under such a subscription agreement. Hor. Binney. Philadelphia, Feb. 12th. 1846.

of the surplus, and entitled to interest thereon from the time when the bank ceased its operations. That the stockholders are liable for the whole amount of their subscriptions; and that, if any further payment beyond fifty dollars on each, be necessary to the discharge of the debts of the company, it will be the duty of the directors to call on all the stockholders for an equal contribution; and that it would be unjust to use the amount paid by one stockholder, beyond the others, for that purpose. That the bank having gone into liquidation, a stockholder may maintain an action against it; and that the loan, being less than the amount advanced by the borrower beyond the other stockholders, may be retained by him, unless required for his proportionate contribution, towards the payment of the debts of the company."

GRIER, Circuit Justice. The argument on behalf of the dissatisfied stockholders is very ingenious and plausible. Its defect lies in the assumption of facts, which do not exist in the case, viz., that the charter of the corporation which constitutes the law of the partnership, permits any other inequality of liability between the stockholders than that arising from the number of shares held by each one: or that a change of this principle is to be presumed, from the practice of the corporation in the division of its profits.

The charter of incorporation contains the fundamental rules which shall govern the corporation, not only as between it and the public, but also as between the stockholders and corporators themselves. As these have been established by law, on grounds of public policy, they cannot be changed but by the consent of the same power, which created the corporation. Much less can it be presumed from any equivocal acts, in the management of the corporation, or the mode of dividing its profits from time to time, that any change has been made in its constitution. The charter of incorporation being the supreme law of the corporation, no usage of its officers in the transaction of their business can change or annul it.

By the charter, the stock of this company was divided into 6000 shares. Each one of these shares is a unit indivisible, representing a certain and equal portion of the whole. The charter might be obtained under a subscription of less than 6000 shares, and individuals might hold unequal numbers of shares, but a share still remained the same. Whether paid in part or in whole by the law of the corporation, which is the contract of partnership, it represented fifty dollars. The man who subscribed a share and paid but twenty dollars stood debtor to capital stock thirty dollars. That debt was as much a part of the capital stock, as the money lent to strangers who had given their notes for the same. Each share of stock being a unit, there could be no inequality among the stockholders as to their liability

for the debts of the corporation or their right to a dividend of profits, except in the inequality of the number of these shares held by each individual stockholder. And whether the stockholder stood debtor or creditor to the corporation for his stock subscribed, the directors had no power to change the fixed value of this unit, or to say that A.'s share of stock shall represent $20; B.'s 30; and C.'s 50.

They might well say, "You, A., have refused to pay up all the calls; we will not forfeit your stock as we might in strictness do for such neglect; but as you are unable to pay up, you may stand debtor to the corporation for your $30. Our dividends do not much exceed 6 per cent. If we should lend you the money to pay up at bank interest, (which is compound interest,) you would get your dividend on your whole $50; but if you retain the interest, or 6 per cent. on your $30, perhaps you will have the best of the bargain. You can take your choice; pay your money and take dividend on $50, or retain $20 or $30, if you please, in your own hands, and credit us with dividends on that amount as set off to interest."

By this arrangement the stockholder who wants to lend money, by general agreement, pays in all his share, and gets about 6 per cent. for his dividend or the use of his money, and the stockholder who has no money to lend to others, retains his $20 or $30, and paying no interest; he of course having his dividend on that amount, by way of retainer. If the bank paid 8 or 10 per cent., the stockholder would immediately find it his interest to borrow money of the bank, and pay up his stock, and thus share in the higher dividend. In the case of this bank, the dividends do not appear to have held out much encouragement to do this. The defaulting stockholders have had undoubtedly the best of the bargain by this arrangement, and if they had not, they had no reason to complain of the consequences of their own deliberate choice.

Now, in order fairly to distribute the assets of this partnership as between A., B., and C., you must first ascertain the amount of capital stock. That by the law of corporation is, say $150, divided into three shares between A., B., and C., equal partners. Of this capital C., we suppose, owes nothing; having paid his $50; but B. owes to capital stock $20, and A. $30. Now, if A. and B. actually pay up their debts to the firm, there are $50 to be paid to each. But if they retain the one $20 and the other $30, it is as plain, that they are the first paid by retainer, and that C. has a right to be made equal to B. before he gets anything more, and both to be made equal to A., who has paid himself $30 by retainer, before A. can take anything more from the heap. After that, if there is profit, they all divide it equally, and if loss, they all divide it equally, according to the fundamental law of the cor-

poration, which gave equal rights and equal liabilities to each holder of one share, and made that share a unit indivisible. It is true, like all indivisible chattels, it may admit of joint ownership; but such joint owners, however numerous, have but the powers, rights and liabilities of one person. Thus there may be multiples of the unit in the partnership, but there can be no fractions. On treating of the assets for the purpose of division, the calculation must be based on this unit and its multiples; the share or number of shares.

Now, taking A. and B. to represent the discontented stockholders in this case. What right have they to complain against the course pursued by the directors in settling this account? They have elected to stand debtors to stock, or in other words to borrow that much of the capital at common interest. If they had chosen, they might have paid in all and received probably a little more than 6 per cent., but they preferred six sure, to the chance of getting more. But this is not all. When the bank began to wind up some years ago, these stockholders retained their unpaid capital, thus having 6 per cent. on it, till this time; while the other stockholders receive their thirty dollars without interest now, to make them equal with those who have retained. If principal and interest were brought into hotch-pot up to this time, and a dividend declared, as might well be done in justice and equity, under a correct construction of this charter, the unsatisfied stockholders would perhaps complain louder than they do now.

If there had been a large amount of profits for this final division, and those who by consent were allowed to retain the $20 on each share, and also to retain their interest in lieu of temporary dividends on that amount, should tender a payment of their $20 with interest up to this time, they would undoubtedly have a right to an equal share of the whole. The agreement among themselves to permit this detention or loan of part of the capital, could not affect their right guaranteed by their charter or articles of partnerships, to wit, that each share should be equal, and the only unit on which to base a proper dividend of gains or losses.

So on the contrary, if the whole capital had been sunk, equity would have compelled the delinquent stockholders to pay up their balance, or if there be a partial loss, still the final distribution of the lessened capital, would and ought to be on the same principle of equality, by calculating such debt to stock as part of the capital to be divided, and if not brought in, as actually retained and received by such stockholders.

A part of the stockholders cannot change the fundamental principles of their charter or articles of partnership, either by their default in paying, or election to retain, a portion of the capital. Nor can a chancellor annul the charter or change the stipulations of the parties, in search of a visionary equity.

Then as to another objection, that if the full paying stockholders had not paid in the money not required of them, the purchase of the United States Bank shares, by which the loss was caused, would not have occurred. It is to be remembered that the purchase was the act of the board, which is the bank. The stockholders, and all the stockholders, are represented by the board, and they neither are, nor can be heard to speak, or seen to act otherwise. How then is A. liable to loss rather than B. or C.? unless it be on the principle that if I lend a man money which he loses by unwise speculation, he may set up as a plea against its payment, that if I had not lent it to him, he would not have lost it, and that as my own act was the primary cause of loss, therefore I should bear it myself. The plea would be demurrable in law, and is without precedent in a court of chancery.

The case in Louisiana is in point, and we are happy to have our own views supported by so well considered a judgment of a court necessarily familiar with the equitable principles of partnership law. This case, it is true, seems to have been overruled at a subsequent date; but as the learned judge who took chief part on the last decision, was the counsel who argued the first so ably, though unsuccessfully, it may be doubted whether the first case will not be considered, abroad, as the better authority.

Let the decree be that the directors distribute the sum now for distribution among the stockholders, paying to each respectively who may have paid in on the stock subscribed, or held by him more than other stockholders, the amount of such excess. And distribute the assets from time to time and as collected, among the stockholders, paying to each any sum he may have paid on each share of his stock more than any other stockholder on each share of his stock, and so toties quoties until the said stockholders are thus made equal in the amount paid in on their respective shares of stock, and pay from any balance or residue which may remain for distribution an equal dividend or proportion thereof on each share held by each stockholder respectively, so that each stockholder shall receive an equal share or dividend of such residue on each share of stock held by him. Decree accordingly.

NOTE. This case was taken, by appeal to the supreme court of the United States, where the decree was affirmed by an equally divided court. According to the usage in cases of such affirmance, no opinions were delivered. A similar sort of affirmance is made in the great case of Aspden's Estate [Case No. 589]. And a question naturally arises on both these cases, and may hereafter arise in others, "What is the nature and effect in law of a judgment affirmed from necessity in a court of error, on an equal division of the court?" The point was considered by the late Horace Binney Wallace, Esquire, in a review not

generally accessible to the profession, of the unreported case of M'Dermond v. Kennedy [Brightly, N. P. 332; 3 Clark, 490], in the supreme court of Pennsylvania. The late Chief Justice Gibson had spoken of that case as furnishing an authority in point, for a particular position: a statement which the editors of the Pennsylvania Law Journal for December, 1846, considered, was not warranted by the facts of the case. The case, it appeared, had come before the supreme court of Pennsylvania on an appeal, involving, in an abstract form, a question relating to the power of municipal corporations to tax in a particular instance. The court below denied the right. The case was argued in the supreme court, and there fully considered by the four judges present: but no opinion was delivered, and the judgment below was simply affirmed. There was no report or evidence of any other particulars in the case. The observations of Mr. H. B. Wallace are as follows:

"If the case, in fact, was deliberately considered by the judges in consultation, and in consequence of this consideration, the judgment of the court of common pleas was affirmed, it is a matter of inferior moment, and not in the least degree affecting the authority of the decision by the supreme court, that no written opinion was delivered, or that by misapprehension or otherwise, the case was not assigned after consultation to any particular judge to prepare an opinion upon the subject. The absence of a written 'opinion' may render it difficult, or perhaps wholly impossible, to determine what principle the judgment of the supreme court did establish, but the judgment is an authority for some principle, whatever it may be.

"There is some doubt as to a part of the history of this case. We do not know all that was done in the supreme court. But materials enough exist to enable us to determine, beyond doubt, that there was here a judgment of the supreme court on a point of law. We know that a judgment of the common pleas denying the right of the borough to assess a certain tax was brought into the supreme court, by writ of error, in order to try the right. We know that there was an argument by counsel before the court, and a consultation upon the case by the court. And we know that, during the term, the judgment of the common pleas was affirmed. Four judges, only, sat; and what were their individual opinions, we do not know. There could not have been a majority in favour of the right, or else the judgment of the common pleas would not have been affirmed. Either the judges were unanimous, or a majority of them were against the right; or they were equally divided in opinion, and the judgment of the common pleas was affirmed from necessity. How this was, no evidence exists to show. Take it at the worst that is possible, and what is the nature and effect in law of a judgment affirmed from necessity in a court of error, on an equal division of the court? The history of the late case of Queen v. Millis will afford an illustration on this subject.

"This case, reported in 10 Clark & F. 534, involved the question whether a contract of marriage per verba de praesenti, but not made in the presence of a minister, in episcopal orders, constituted a full and complete marriage at common law. On an indictment for bigamy, which depended on this question, the court of queen's bench in Ireland, four judges sitting, were equally divided, but afterwards, and for the purpose of obtaining the judgment of the house of lords, one judge, who had been in favour of the validity of the marriage, in form withdrew his judgment, and thereupon a judgment of acquittal was entered, and the case was brought by certiorari to the house of lords. In the house of lords, Lords Abinger and Cottenham and the lord chancellor were of opinion that it was not a perfect marriage, and were for affirming the judgment; Lords Brougham, Denman, and Campbell were of the opposite opinion. The entry on the journals of

the lords is, 'It was ordered and adjudged by the lords, that the judgment given in the said court of queen's bench be, and the same is hereby affirmed; and that the record be remitted,' &c. And the fuller entry on the minutes states that Lords Cottenham and Campbell having been appointed to tell the number of votes, it appeared, on report thereof, that the votes were equal, that is, two for reversing, and two for affirming, 'whereupon, according to the ancient rule in the law, "semper praesumitur pro negante," it was determined in the negative. Thereupon the judgment of the court below was affirmed, and the record remitted.'

"While this case was pending in the lords, the case of Catherwood v. Caslon, involving the same general question, came on in the English court of exchequer (13 Mees. & W. 261), and after argument, judgment was suspended until the decision of that case. 'The case of Reg. v. Millis' [8 Jur. 717], says the reporter of the case in the exchequer, 'having been determined, and the invalidity of a marriage at the common law, contracted per verba de praesenti, but not in the presence of a priest in holy orders, having been thereby established, the present case came on again for argument.' The counsel sustaining the side of the marriage admitted that 'according to the decision of the house of lords, it must be taken that no valid marriage had been contracted;' and Parke, B., in pronouncing the judgment of the court said, 'The parties in this case entered into a contract of marriage per verba de praesenti, in the presence of witnesses, but not proved to have been made in the presence of a minister in episcopal orders. Since the original argument, it has been decided in the house of lords, in the case of Queen v. Millis, that unless in the presence of such a minister, such a contract does not constitute a valid marriage at common law in this country; and by the authority of that case we are bound.'

"Undoubtedly, the affirmance of the judgment in Queen v. Millis was against what had been the general impression of the profession after the case of Dalrymple v. Dalrymple [2 Hagg. Const. 54], yet no one in the exchequer suggested that the affirmance in the house of lords by an equally divided court had not settled the law by conclusive authority. An equal division of a court of error, on a question of reversing a judgment, is like a tie vote in a legislative assembly on a question of enacting or repealing a law. The binding nature of the decision is the same, as where the action of the body is unanimous. The influence of an opinion, on the minds of professional persons, will depend on the character of the judge who delivers it, and on the number of judges who unite in it: but the authority of a judgment of a supreme tribunal, as establishing a principle and settling the law, is the same whether the court be full and unanimous, or partial and divided. A judgment affirmed by a divided court binds inferior courts, and of course is a precedent in the court in which it was entered. And not only is the judgment of a court, in itself, an authority; but it is the only thing that is an authority. It follows that Chief Justice Gibson was strictly accurate in saying of M'Dermond v. Kennedy [supra] that 'had the case been reported, it would have furnished an authority in point.'"

---

KREMER (EVANS v.). See Case No. 4,565.

KREMER (WALKER v.). See Cases Nos. 17,-076 and 17,077.

KREPLIN, The ELWIN. See Case No. 4,427.

KREPLIN, The ELWINE. See Case No. 4,-426.

KRIEGER (RANDALL v.). See Case No. 11,-554.